We'll hear argument next in the tandem cases of Donohue v. Millen and New York State Thruway employees at Al v. New York State Thruway, 172832, 2833, and 2834. Thank you. So part of the reason, Ms. Barasa? Yes, Ms. Barasa, Beth Barasa for the propellant defense. So Ms. Barasa, part of the reason I gave 20 minutes was it was not clear to me that there were any, well, it's not clear to me that there are not differences in the three cases. And if there are differences, let us know that. We don't believe that for purposes of the issues that are presented on this appeal that there are any significant differences between the three cases. Perhaps that will accelerate this process. Thank you. This interlocutory appeal in all three cases presents two issues, each of which provides an independent basis for reversal of the district court certified order denying summary judgment to defendants on plaintiff's freedom of association and equal protection claims. First, the district court erred by holding that a brand new class, specifically union represented employees during bargaining, are protected under the First Amendment and may assert claims based on freedom of association. In doing so, contrary to all prior precedent, the district court extended freedom of association rights for the first time to the members of a compulsory association, a bargaining unit for which a union has been granted exclusive representation rights under state law. Second, the district court erred in applying strict scrutiny to layoffs within the thruway authority solely because the layoffs occurred during collective bargaining and impacted union represented employees without first finding that the impacted employees were singled out for a penalty. As a matter of public policy, if the district court's decision with respect to plaintiff's freedom of association and equal protection claims is not reversed, it would affect a drastic change in the balance of bargaining power between public employers and unions. That is a balance that has been carefully maintained for decades under New York State's Taylor Law. Such a precedent would also effectively guarantee that any layoff affecting union represented employees during bargaining would be taken straight to federal court for strict scrutiny review, resulting in an unprecedented flood of additional federal litigation. But in this case, we've got only a handful of people who fall into the non-union member but represented by the union for collective bargaining purposes category, right? Yes. Thirteen or so, correct? Thirteen who were impacted by the layoff.  I understand that. So if this class were redrawn to just be the union members, that would solve the problem as far as you're concerned? It would be a protected class. Those are not the claims that were presented to the district court. Those are not the claims that are within the scope of the certified order. The district court created a new protected class for the first time of union represented employees during bargaining. If it had been one, I mean, look, the numbers may not matter, but if it had been just one AFP, you would still be making the same argument? Yes, because it's the nature of the group for which protection is sought, Your Honor. To have any freedom of association claim, at its heart, the freedom of association presupposes the freedom not to associate. It presupposes the ability to join a protected group or to opt out of that group. These people actually made voluntary financial contributions to the union. Is that correct? The union members did, Your Honor, but that is not the basis of the claims that were presented here. Agency payers don't voluntarily pay. They have to pay. It's a shop, so the non-union members have to pay an agency fee, right? That is true, Your Honor, but aside from the financial difference, the major difference is that unlike the union, which is formed by the voluntary choice of its members, a bargaining unit is formed by operation of law. When the union has a majority, then it selects the titles that it believes it should represent. Let's step back because the certified questions in the context of a bargaining unit. Let's step back from the bargaining unit for a second and just take union membership. The union represents all the employees within the bargaining unit as to the terms and conditions of employment, right? Yes. And who can vote on approval of the terms and conditions of employment? Only the union members, correct? That is correct. The agency payers can, right? That is correct. So why isn't the conceded reduction in force that's directed against only those bargaining units directly related to union membership, then, since they're the only ones who have the power to approve what would have been the offer by the three-way authority for the concessions that it sought? That, I think, Your Honor, goes to the plaintiff's efforts on this appeal to change the nature of their claims from bargaining unit union representation in a bargaining unit to the activity of rejecting concessions. They're really, plaintiffs here, we think, are trying to blur two critical distinctions. It's true that you concede that the reduction in force was related to the fact that their rejection of the three-way authority's in regard for the collective bargaining agreement with regard to their participation in the cost of their health care. That is correct. But the claims that were presented to the district court... Who were the sole... We'll get to that in a second. But who were the sole people able to approve the union, the state's offer, the three-way authority's offer to the union, or to those who are bargaining on behalf of those that are members of the bargaining unit, who were the sole people that could approve that offer? That would be the union, Your Honor. However, they are acting on behalf of a compulsory association of bargaining unit members. And the cases decided by the Supreme Court, such as the Roberts v. J.C.'s case, has always been clear that you cannot have a freedom of association without the freedom not to associate. And that freedom is lacking here. Plaintiffs in the district court had two different types of claims. They had targeting claims based on union representation. That is what the district court decided. And then they had separate claims of retaliation based on the activity of rejecting concessions. On this appeal, plaintiffs are attempting to recast their union activity claims into their targeting claims. And when the nature, when the basis for the claims is union activity, those are still claims to which strict scrutiny does not apply. Under the Rutan line of cases on which Roland is founded, strict scrutiny applies to freedom of association membership claims, and can also apply to certain types of activity claims, but does not apply to the only activity that is at issue here, which is rejection of concessions. Don't the CFPs agree at some level to have their fees, I mean, they're not union card-holding members, but they agree to, or at least they don't object to the use of their fees for the union's purposes. Is that right? Your Honor, the agency fees are not the critical issue here. The payment of fees we respectfully submit is not the critical issue. It's the nature of the association for which protection is sought. But when you put it that way, so I'm trying to figure out what the little blocks are that get us to the point that you want us to be, and I'm trying to understand who these AFPs are. That is, they don't have an objection to their fees being used for certain union purposes. Is that correct? Following the Janus case, Your Honor, that was decided by the... No, no, no, no, no. Is that correct in this case? The agency shop fee payers were paying the union for their bargaining services. They were required by law to do that. Do they have an opportunity to object to the use of their fees for certain purposes? Not for collective bargaining, no. They had at the time no opportunity to object. They could object to the use of their fees for other purposes unrelated to collective bargaining. Political or ideological purposes, for example. Yes, but that's not the critical issue here. Okay, I understand that you don't think it's a critical issue, but it might be critical to me. They don't object to the use of their fees for those purposes. So they've got some sense of association with some aspect of what the union is trying to do, because they could object, but they don't. Correct? We would disagree, Your Honor. The entire bargaining unit is formed by operation of law. It is a compulsory association, and indeed in the Janus case that was decided by the Supreme Court in June, Janus recognized that the entire bargaining unit is a compulsory association. As a result of Janus, the former agency shop fee payers no longer have to pay for the union's services at all, for collective bargaining or anything else. However, they are all— Well, look, we can change the question. But the question that was certified was whether Roland extends to a group that includes these AFPs. Is that right? The question before you is whether freedom of association rights should be extended to members of a compulsory association, a bargaining unit that is formed by operation of law, represented by a union who, by law, is designated as the exclusive bargaining representative. We submit that strict scrutiny does not attach to the plaintiff's claims here for two separate and independent reasons. One, the entire bargaining unit lacks a voluntary choice to be members of the bargaining unit. They can choose to be union members, and that is protected. But they can't choose whether or not to be part of the compulsory bargaining unit. In addition, before strict scrutiny can attach, there not only has to be a protected right to voluntarily associate, there also has to be a right—there also has to be a violation of that right. And in particular, for strict scrutiny to attach, there has to be a singling out and penalizing of the plaintiffs for their freedom of association rights or other substantial burden. That was not present here because, unlike in Roland, the authority obtained budgetary savings from all groups of its employees. Nothing in Roland suggests that the only way to avoid a targeted layoff is to treat all employees the exact same way at the exact same time. And this Court should not impose such a rule here because of the significant infringement that would have on an employer's prerogatives to manage its finances and operations and efficiencies. Under the Taylor Law, the employers have to be free to treat different groups of employees differently. But—so this goes back to the certified question. Because, look, you could have appealed, I guess, ultimately, but what we've got here is a certified question that asks us whether we can extend Roland to this situation, right? And if you're right, that if you prevail and show at a trial that you did not, your client did not target these people because of their union membership and there were other reasons and there were legitimate sound grounds for the reduction in force, then you win. But right now, I think it's a very narrow question that is unrelated to the targeting question. It's just, does Roland extend to this group, this set of people? And we submit that it doesn't because regardless, Your Honor, of whether there is one non-union member in the bargaining unit or 100 on any given day, because that will vary, freedom of association rights have never been extended by this Court or the Supreme Court to a compulsory association of bargaining unit members. And if it is, Your Honor, if the district's court decision were affirmed, we would have a situation where virtually every layoff during bargaining within the public sector would automatically be subject to strict scrutiny. The court's dockets would be flooded and the very careful balance of economic power . . . because of their membership. We respectfully submit that there was no targeting here, but before you even get . . . Well, I know that that's the argument, but that's not exactly before us yet. We agree that you only have to reach the penalty or targeting argument if you find that union-represented employees during bargaining are a protected class and they cannot be for the reason that was articulated by the Supreme Court in Roberts v. Jaycees. You have to have a right to opt out. And bargaining units are formed by operation of New York Civil Service Law, Section 207. Unlike union membership, they are not formed by the voluntary choice of their employees. In Rowland, the nature of the claims was based on union membership. Here, the nature of the claims presented by the plaintiffs and decided by the district court was based on union representation during bargaining. I mean, I think the argument is it's the same thing. These other folks are just incidental or collateral damage, but the real goal here was to punish the union for the union's decisions. And if a couple of these other folks happen to be affected, so be it. But that's what makes this indistinguishable from Rowland. Isn't that what's going on here? No, we disagree, Your Honor. In Rowland, the court found that employment decisions based on union membership are protected. In Rowland, the plaintiffs brought separate claims of retaliation based on their union activity of rejecting concessions. This court never reached those claims but suggested that pickering, not strict scrutiny, would apply. And here, if the focus of the plaintiff's claims, as they're trying to do on appeal, is changed from their status, from who they are, union-represented employees, to their activity, the union's decision to reject concessions, then those are not claims to which strict scrutiny applies. Let me ask you this. Let's go back to these NAACP cases, the Freedom of Association cases in the 50s and 60s. If there were 5,000 African-American members of the NAACP and 10 white European-American members of the NAACP, and whatever state actor, public employer, tried to shut down a meeting of the NAACP, what would your argument be there? That, we would agree, is protected by the Freedom of Association. How is that different? Because all 5,000 in 10 of the members, the 5,000 black members and 10 white members, would have all made a voluntary choice, regardless of their race, to join the NAACP. Let's go back to my initial set of questions. These AFPs, they don't object. They're not union members, per se, but they don't object, so their fees go. They have no objection. They have a right to object, but they do not object to certain, maybe all of the purposes of the union. They don't have the right to opt out of the bargaining unit. They don't have the right to not be represented by the union for purposes of collective bargaining. And, again, going back to if the focus is on the activity of rejecting concessions, union activity that directly implicates the operations and efficiency of the government employer, not as a sovereign, but as an employer, have always been subject to a Pickering balancing test and not to strict scrutiny. Here, when the union rejects concessions, because of the operation of the New York State Triborough Amendment to the Taylor Law, which is 209A1E of the Civil Service Law, the public employer has no other opportunity to reduce its costs except through layoffs. You're using a term that my federal colleagues aren't familiar with. Triborough. Triborough says that you can't reduce benefits. During the term of negotiation, you can't reduce benefits, or after if they break down, you can't reduce benefits that the employees are already engaging in. So, for instance, with regard to the two bargaining units that are in question here, the fact that they were not paying for their family health care, the employer could not unilaterally at that point in time start to require them to make those payments, right? Correct, and could not change any other terms and conditions of employment. You mention that because you say that it creates a dangerous, difficult situation for the public employer because the bargaining unit can just sit back and not agree to concessions where the public employer is seeking to reduce costs, which the thruway authority was seeking to do in this instance. They could and they did for at least over four years after the agreements in question expired. The playing field that the legislature and the governor decided to create with regard to public employer and public employment negotiations. That is, and that is why when the focus of the plaintiff's claims changes from their status or who they were, which is what the district court decided and what Rowling decided, except Rowling was critically based on union membership. Vis-à-vis the agency fee payers and the union members, who are the only group of individuals capable of acceding to the thruway authority's demands? The union members. So therefore, wouldn't one conclude that by doing the reduction of force against those, the places, the two units where those people are found is indeed directed at union membership? No, Your Honor, it's directed at union activity. It's directed at the, if you're going to look at it that way, then it's based on the activity, the rejection of concessions. That was not the basis for Rowland. Rowland, again, was, Rowland's holding was that decisions based on union membership are subject to strict scrutiny. Who the plaintiffs are rather than what they did. When you focus on what they did, it's a pickering balancing test because of the necessity of weighing the employer's interest in operation and efficiency, which would be completely shut down by the rejection of concessions if they cannot lay off. You've reserved three minutes for rebuttal. Thank you. Thank you. Thank you, Your Honors. Greg Adler for the plaintiffs in the New York Thruway Authority Teamsters case. No difference in any of these cases. We agree. There's no difference. And we've just split our time by 10 minutes just because we have 20 minutes. But I want to be really . . . You take less time. I know. I'll try. I want to be really precise. And I think the issue, the legal issue before the court based on the order is, does the Rowland analytical framework not apply simply because the record, in this case, reflects that a handful of agency fee payers were impacted by the employment actions that were targeted at the bargaining units and effectively targeted at union members? And we've argued below. And it's just so . . . We have shifted our emphasis somewhat from our initial argument. And honestly, that's partly because the plaintiff's brief to this court was exceptionally clear in a way that made us rethink some of the issues. But the question is whether the order is correct, whether the denial of summary judgment was correct in its de novo review. This case on its facts is exactly parallel to Rowland. The stipulation in Rowland, the full stipulation in Rowland, is in the record. It's at Joint Appendix 4930 to 4946. It's the end of the last piece in the Joint Appendix. I urge you to read that carefully because what happened in Rowland is exactly what happened here. If you look at particularly paragraphs 46, 47, 49, 51, 55, and 60 of that stipulation, what occurred is the governor sought concessions, it's actually almost the same sorts of concessions on health insurance. The unions said they weren't willing to do that. And the governor, in response to the union's unwillingness to accept those concessions, directed the agencies to eliminate positions within bargaining units. That is what happened. This controversy about the stipulation is in one of the phrases, they talk mostly about unionized employees, but there's an agreement in the stipulation, and this was so the governor wouldn't have to testify, but was that the targeting was at union members. But in fact, if you read the stipulation, the targeting was directly at bargaining units, which was clearly a proxy for union members. At the petition for cert stage, there was some acknowledgement that there were at least some agency fee payers, because every collective public sector collective bargaining agreement used to have some agency fee payers. Now, after Janus, there are no agency fee payers. So they're either members or non-members. But the same legal theory for us would apply whether the 13 people, and there are nuances, right? And Judge Lohe picked up on it. There are nuances because agency fee payers pay for union political expenses, although they could object and then they'd only pay for collective bargaining. But the critical thing, I think, as Judge Wesley was pointing out, is that only union members get to vote on the contract and get to participate in collective bargaining. And in the two most recent Supreme Court cases on the associational rights of people to be either members or non-members of union, that's Janus and Knox, the court made clear that this associational right includes associational activities. And this court in Rowland picked up on that. And on page 134, it says, Indeed, Knox effectively precludes defendants from arguing that cases holding it unconstitutional to fire or refuse to hire union members are distinguishable because defendants here acted not out of hostility to union membership per se, but as a tactic to put pressure on the union in labor negotiations. That's what happened. The associational activity here is not just that there was hostility because people were union members. There was hostility because the union was exercising the associational rights to take a particular position in negotiations. And that does not transform this to a Pickering-Cobb case because it's an associational case by a group of employees. And if you read, if you look at Janus again, there's a lot of discussion by Judge Alito in Janus about why Pickering doesn't really make sense in the context of a pure associational or associational activity case. Because Pickering is designed to deal with, well, an individual takes certain action that's under, the certain public employee takes action that raises an issue of public concern, and then the government takes action against that individual, and then the government can justify its action based on a balancing of the government's interest as an employer and the employee's interest. This case doesn't really raise any of those questions. And Janus, and to some extent, Knox, which is a precursor to Janus, make that clear. This court got it right when it said this is a targeting case. But let's stop for a second. I want you to respond to something that Ms. Barasa said. She said this is a bargaining unit formed not by voluntary association but by operation of law. Do you agree with that? Well, not exactly. I mean, originally a bargaining unit is formed because the members vote to form the bargaining unit. They have to vote for the union, right? You don't vote for a bargaining unit. You vote to be represented by a union. And if a majority of the employees in the bargaining unit vote to be represented by a union, then they're represented by the union. Your view wouldn't make any difference then whether it's 51 percent union members and 49 percent non-union members in this bargaining unit? It might make a difference on the means test. But so the way I think part of the problem is, and it's probably our fault, like there's a little bit of a conflation between the notion of what the protected class is and versus what the class that would be certified. If you look at the role in stipulation on page 4937 of the joint appendix, that class is exactly the class that we ask to be certified here. It's all members, it's all people employed by a certain date who are members of a bargaining unit represented by these unions. In some cases, the bargaining unit and union membership are going to be indistinguishable. They're going to be the same. And so it could be a proxy, like making a decision based on one might actually be a decision based on the other. But that's not always going to be the case, right? It's not. Well, it's not always. It is in this case, but it's not always the case that it's a proxy. In this case, there's a dozen or so people who are not members of the union, right? Right, who were impacted out of 548. So what I'm saying is the distinction that matters, and I think it matters also after Janice, is because to me, the associational right is to be a union member and then to participate in the collective bargaining process and take a position. I don't think, and we may not all agree on it, I don't think after Janice in particular that non-members have the same protection of association by just being in a bargaining unit that the members have. But what I'm saying is under the facts of this case, just as the facts of Roland, the targeting was directed at union members, and union members made up, you know, whatever it is, 97.5% of the people who were targeted, who were impacted by the adverse employment action. The question of fact, yes. I think that's undisputed, that the 97.5%. But the class is drawn differently, right? The class is drawn differently because those 13 non-members or agency fee payers who were impacted should be part of the class because they lost. How are their associational rights being affected? Their associational rights aren't directly. Why are they then part of this class? Because if you take, let's use another, let's say if you fire, if you eliminate 100 positions because 98 of them are African Americans and the two people who are non-African Americans who are impacted that are only impacted because it's an incidental impact of the intentional discrimination, in that case, against African Americans, those people should be part of the class because they lost their job. A class of people discriminated on the basis of their race? No, as a remedy for certification purposes. You have to articulate a class in terms of the harm, right? Right, and the harm is they lost their jobs because of the discrimination. Losing a job doesn't entitle you to strict scrutiny. Losing a job because of your membership in a protected class might. Well, I mean, I think it's an interesting distinction. We think that because Janice made clear that the union has, and the state has a constitutional obligation not to discriminate against non-members. That's stated explicitly in Janice. So if non-members lose, if five non-members, let's say you use this case, if 13 non-members lose their job as a result of the state's illegal targeting of members, then they lose it as an incidental consequence. They should be part of the class that's entitled to the remedy because they only lost their jobs because. . . I don't understand you. Your view, your position is that those 13 or so people do not have associational rights, at least in the context of this case, that are impacted. They don't have the same associational rights as the members. Not the same as the members. Right. They're not even voluntarily part of this association. Well, so they're voluntarily part of contributing to union political activities because they don't have to do that. They might be able to do that. But no. . . Whether they want to or not, the bargaining unit includes them whether they like it or not, right? Correct. I agree with that. And so. . . So the reason. . . How are their constitutional rights affected by this? They're not. But those. . . The whole class is aligned in terms of a constitutional right? No. So there are two issues, okay? What's the protected class and what's the class that's entitled to relief for class certification purposes? And this is exactly. . . If you look at the class in Rowland, it's all bargaining unit members, which includes agency fee payers. Out of 3,000 people who were laid off, a bunch of them were agency fee payers. That's just the way it is in the world. But the reason that I'm saying the 13 agency fee payers are properly part of the certified class is because if they. . . This was a targeting case. And if they only lost their jobs because of incidental damage as a result of the unconstitutional targeting of union members, then they are entitled to a remedy. They might be entitled to a remedy, but they're not entitled to the same remedy, right? Because the damages here are going to be perhaps focused primarily on the loss of the job, but it's also going to be the violation of a constitutional right, correct? Well, I'm saying. . . That's going to be part of the damages, correct? Yes. So why should the non-union member be entitled to the same damages as a union member when you've just acknowledged that they don't have any associational rights? Because they are victimized as a result of the illegal unconstitutional targeting. And it is similar to me in other types of discrimination. If you're a victim because the employer's trying to get at or trying to impact some protected class of people, and you just happen to have a certain seniority that causes you to be in the way and you lose your job, in a section, you are a victim of the employer's discriminatory conduct against those with the protected associational rights. That's not Rowland. No, no. Because it didn't have. . . So the only thing in Rowland. . . That doesn't even necessarily flow from Rowland. It doesn't necessarily flow from Rowland. I'm just trying to explain the difference between the. . . It's a very narrow question of the extension of Rowland to this set of facts. And what you've told us is that with respect to these AFPs, they don't have an independent associational right in the context of this case. They don't have the same associational right. They're not members of the union. What I'm saying is. . . And the only reason this didn't come up in Rowland is because. . . But I thought that at the very beginning of your argument, you were making a point or you made a point about we should look at the association with the union. It's really about union activity or inactivity. So the associational activity is not just being in the union. It's the actions taken by the union, and that's what Rowland found. It's not that there's necessarily anti-union mentality. It's punishment of the union members because of the position taken by the union. Let you be on your side. Sorry. My ten minutes. Mr. Kaplan. Good afternoon. I believe. . . May it please the court, Aaron Kaplan, appearing for Darren Reilowitz, Civil Service Employees Association, representing the plaintiffs appellees in case docket numbers 17-2832 and 17-2833. I just wanted to take the opportunity to respond to a couple of the points that were made regarding agency fee payers. Specifically, first and foremost, they, in this case, there's agency fee payers and then there are objectors. Objectors are essentially, can be a subgroup of agency fee payers. Objectors are the people who not only don't want to be members of the union, but they express that by saying they don't want to contribute to the ideological and political functions of the union and they provide that in the form of a letter and they receive, under operation of New York law, the union then provides them back the share of the fees that they pay. They get reimbursed for the expenses that the union spends for political and ideological purposes. We have none of those here. If you did, would it matter? Would this be then an overly broad class if, in addition to 13 AFPs, you had four of them who were objectors? I don't believe so. I don't believe that's the case, but to the extent that there was, at some point, some claim, and I believe that this first appeared in the defendant's response to plaintiff's motion for summary judgment, that these agency fee payers affirmatively state that they don't want to be part of the union, that that is just not accurate, and that there is a difference. But even the objectors have to pay for the collective bargaining aspect of the union, right? They do. So they're associated whether they want it or not. They are associated, although they don't necessarily, as my colleague stated, they don't necessarily exercise the same right to association. That's their argument, right, that this is sort of critical because the constitutional right to associate recognizes the ability to associate with the people you want to associate with. These people don't necessarily want to associate at all with the union, right? If they did, they'd be members. Well, it's not clear what the record below demonstrates that it's not clear why these people weren't members, that they had not filled out a union card, or perhaps they had in the past, and due to administrative reasons, they were not. There's no clear... Well, they may have been at some point. We're not sure. But I mean, we're trying to understand the nature of the right that's being violated. They're either a member or they're not a member. Correct. And if you're a member, then the real nature of the claim that you're raising here, I mean, the Rolland right is a membership right within the union, right? Correct. That's an associational right. The question here that your opponent raises says, well, you've got people in here that are not members, and so therefore it's not an associational right whatsoever. It's more akin to the difficulties that occur between an employer and its representative associations that were non-associations in dealing with the employment situation. But for you to win, the 14th Amendment aside, 14th Amendment issue aside, on the First Amendment associational right, you have to be a member, right? Yes. And the problem is that not everyone is a member within the bargaining unit, and so your opponent says, therefore, this is not about a membership right. This is about bargaining units, and so therefore strict scrutiny shouldn't apply. And that is where I think that the defendants are attempting to essentially put the cart before the horse here, to say that, well, there were a few agency fee pairs, which the union still represents and has to represent in good faith. They didn't ask you to do it. They didn't join. They didn't pay. They didn't willingly pay. They didn't sign a union card. So the point is, is that do we look at this in terms of the bargaining unit? Because we're free to affirm on any grounds that, and we don't have to answer the certified question. We can answer or raise any question we choose to do so. An earlier panel decided to certify that question, okay? But now this comes before us, and our powers are broader than just deciding the certified question. And so the questions that you've been getting or that have been posed are, is there something less than the bargaining unit that would afford, would accommodate, that would require an affirmance for a reason different from that which was employed by the district court? And so that's why, to my mind, why there's been a number of questions about the differentiation between those who can vote on the contract and those who get the benefits of the contract. And so I ask you, do you want us to decide the bargaining unit issue, or do you want us to decide an associational right issue as we understand it? The associational right issue. I had a feeling that that was your answer. What defendants want here is to skip over strict scrutiny and move aside from it because there were a handful of agency fee payers. Your friend has said that these AFPs have no associational rights that are being impacted. Do you agree with that? Yes, that they have not exercised those associational rights to be part of the union, that they have not exercised those rights. You see it as not associational rights relating to union activity. You see it as union membership associational rights. The union members are the ones exercising the associational rights, but I think that what gets lost there, perhaps, is what happened in this case and what the employer, the thruway authority, the canal corporation, what they were attempting to accomplish, and that was interference with those associational rights of those members. So maybe the solution is to just draw a narrower class for purposes of the constitutional claim because the harms to the members is different than the harms to the non-members, isn't it? Yes, the harm is different. Everybody is mostly interested in their jobs and pensions, I assume, but there's still going to be some amount of damages, if you win, that goes to the constitutional violation, right? There should be. Messing with your right to associate, and that's going to be different for members and, I guess, non-existent for non-members, right? Yes, and that is the difference as far as I believe what my colleague was saying was that's the difference with respect to, for example, class certification and damages versus the protected class at issue. But isn't this the wrong class to be applying strict scrutiny to? Because the only reason you're getting strict scrutiny is because of the constitutional harms that are visited on the members of the union, right? I'm sorry, are you referring to the certified question, the class in the certified question? Well, I mean, the class is defined based on membership in a collective bargaining unit, not membership in the union, right? Yes. In some cases, that will be, that's the same thing because everybody in the collective bargaining unit is in the union, but that's not true here, right? Correct, and it's generally, it's usually not true. I mean, there's usually always a few non-members at least, and yes, I agree, the focus, the targeting was union members, and there were, because of the way the thruway authority constructed the layoffs and the way civil service law operates, there were some agency fee payers, but to take it out of the realm, to take the layoff out of the realm of interfering with the associational activity just because a few of the people they... You're not providing a theory of associational rights, I think. So when you say a few, if it had been 50 AFPs, would we be in a different place? In the context of what happened here, we're in the same place because the thruway authority proceeded with the layoffs in order to interfere with the associational activity of the members and the associational rights of the members. The way they went about this in essentially threatening the members, telling them that if their union comes to an agreement... Isn't that presumably a question of fact, and wasn't that a reason for denying summary judgment? It's a question of fact, but defendants want to jump over that question of fact and just say that because... We've got a certified legal question before us, and the question was whether Roland extends to a situation where non-union members, who now you've conceded have no associational rights that are being impacted, whether Roland extends to non-union members even though the majority, the significant majority of people impacted by this reduction in force are union members. That's the question as I see it. That's the certified question, yes. We think that the certified question kind of misses the point, frankly, because it doesn't need to be so broad that you have to have the bargaining unit or everyone in the bargaining unit engage in associational activity for those who are members to be protected. The fact that the... You concede that these AFPs do not, at least on this record, there's no showing that they engage in associational activity in a relevant way in this case. That's correct. Well, thank you very much. Thank you. Claims based on union membership are not within the scope of this certified order, and while we agree that this court is not bound by the precise controlling question of law presented, this court is bound and limited to the four corners of the certified order. Plaintiffs made a strategic decision several years ago to cast their targeting claims as solely based on union representation. Those are the claims that were presented. They admit that right at the outset of their brief on page 3. They say these are the sole claims we presented, union representation, and those are the only claims that the district court decided. So we would respectfully submit... My sense is that there would be the same argument even if there were 150 AFPs. There would be the same argument if there was one or none or 150. When the basis for the claim is union representation, there's no voluntary choice to be represented by the union. Mr. Adler noted that a bargaining unit is formed by majority rule, but majority rule does not create a freedom of association. If a majority of voters in this state elect a Democratic governor, we're all bound by what that Democratic governor does on our behalf, but we don't all have to become Democrats. You're drawing the distinction on the fact that because the union was doing the negotiation, you used the term union representation, and you're saying because the activity is directed at the union representation, i.e., those who are doing the bargaining, that that's not necessarily an associational discriminatory act because the representation is broader than the membership right? We're saying that it's not associational because the representation is not a voluntary choice by members of the bargaining unit. Okay, but if we agree with you and we send it back to Judge Scullin, what's to prevent them then from just drawing this class more narrowly to be the union members because those are the tuna and the AFPs are just a handful of dolphins who get caught in the net. They don't have associational rights, but the union members do, and that's really what's driving this training. We're going to be in pretty much the same place, right? No, we would not, Your Honor. It will be a smaller class by 13 members. They made a strategic choice years ago to base their claims on union representation, and we don't believe they get to start over now. You're saying it's too late because I had the same question. It's too late to allow them to narrow and to amend. That is not within the scope of the certified order. Judge Scullin, that's one you guys will fight out with Judge Scullin if it comes to that, right? We believe that it is much too late that they have waived any claims based on union representation by staking out their strategic position based on union. I'm sorry. They've waived union membership claims by staking out a strategic position based on union representation. There's nothing to prevent us from asking Judge Scullin for his views. I mean, I know you believe that, but why don't you make that argument, or why can't they make the counterargument before the district court? Because it is not within the scope of the certified order, and if I could just turn to the activity. But if we send it back, then it's a Rule 5 issue as to whether or not you want to amend, right? Rule 15, 5, 15, 15. We don't believe so at this point, Your Honor. If I could just touch on the activity claims again. This court, in the decision cited on page 11 of our reply brief, has routinely held that when the nature of the claims switches to activity, in this case rejection of concessions, that impacts the operations and efficiency of the employer, that is not a strict scrutiny claim. So even if this court were to find that collective bargaining activity, and particularly rejection of concessions, can be protected under the freedom of association, it would be a pickering test. The plaintiffs have presented no claims before this court that are subject to strict scrutiny. No matter how many times they try to change the theory of their case, they have the same essential problem. And if this court allows the class that was drawn by the district court, which was its first error, to extend Rowland to an entire bargaining unit, and then allows the plaintiffs to avoid having to show any penalty before strict scrutiny applies, which was the second error of the district court. The district court found that strict scrutiny applies simply because the layoffs occurred. Can I ask one simple question? Has the class been certified? The class certification motion is still pending. Thank you. Thank you very much. Thank you.